Kelly, J.
I respectfully dissent. In its decision, the majority creates a test that can be used to discern whether a building is open for use by members of the public under MCL 691.1406. However, I find that the test is unclear.
Moreover, I believe that the Court of Appeals did not clearly err in its decision on remand, given our explicit directive to it to apply the holding in Brown. The Court of Appeals construed Brown in the only way possible. Also, like the Court of Appeals, I am unable to distinguish the residence hall in this case from the jail in Brown when applying the Brown test.
I. THE COURT OF APPEALS DID NOT CLEARLY ERR
A brief examination of the cases interpreting MCL 691.1406 reveals that no adequate method has been established to determine when a building is open for use by members of the public. This is underscored by the fact that the Court of Appeals has decided this case three times and, now, for the third time, is told it did not correctly interpret § 6.
A. THE BROWN DECISION
In Brown v Genesee Co Bd of Comm’rs (After Remand),[1] the Court devoted a few paragraphs to discussing whether a jail is open for use by members of the public under § 6:
*622 Plaintiff claims to have injured himself near a shower stall in defendant’s jail. Under Kerbersky, we examine the public’s access to the jail rather than the shower area. [Kerbersky v Northern Michigan Univ, 458 Mich 525; 582 NW2d 828 (1998).]
Green v Dep’t of Corrections, 386 Mich 459; 192 NW2d 491 (1971), held that a jail falls within the scope of the statutory exception. In other decisions, this Court has implicitly assumed as much. See, e.g., Wade v Dep’t of Corrections, 439 Mich 158; 483 NW2d 26 (1992).
We would reaffirm that a jail is open for use by members of the public. Family, friends, and attorneys may generally visit inmates. Members of the public may also enter a jail for other reasons, e.g., to apply for a job or make a delivery.
The fact that public access to a jail is limited does not alter our conclusion. Schools fall within the exception even though members of the public may not enter whenever and wherever they please. See Sewell v Southfield Pub Schools, 456 Mich 670; 576 NW2d 153 (1998); Bush v Oscoda Area Schools, 405 Mich 716; 275 NW2d 268 (1979). The public building exception applies to buildings with limited access, including schools and prisons. Kerbersky, supra at 534; Steele v Dep’t of Corrections, 215 Mich App 710, 715; 546 NW2d 725 (1996). [Emphasis in original.]
Analyzing this discussion, one finds that there are two discernible approaches to concluding why a jail is open for use by members of the public. First, the Court could be following the analysis suggested in Green. However, the opinion tells us that it does “not approve the reasoning in that decision.” Brown, supra at 436 n 4.
Next, the second paragraph states that a jail might be open for use by members of the public because “[f]amily, friends, and attorneys may generally visit inmates. Members of the public may also enter a jail for other reasons, e.g., to apply for a job or make a delivery.” The third paragraph tells the reader that *623 “limited access” to a building like a jail does not preclude its being open for use by members of the public.
Therefore, the reader is given two possible reasons that a jail is open for use by members of the public, then told not to rely on the first one. The logical conclusion is that the second reason given is the reason the jail is “open.”
Notably absent from Brown is any description of the jail in question. Does it have an open lobby that one can enter freely? Is there a checkpoint outside? Is there a guarded gate? How is it like other jails? The answers to these questions are left to the imagination. The reader is given the impression that all jails are open for use by members of the public, regardless of their structure or how they limit access.
B. THE REMAND AFTER BROWN
After Brown, the Court remanded this case to the Court of Appeals for the second time, for reconsideration in light of the new decision. The Court of Appeals attempted to apply the reasoning in Brown.
Here, the building in question is not a jail, but a residence hall. If a jail is “open for use by members of the public” by virtue of the family and friends that may visit inmates, it certainly follows that a residence hall would also be “open for use by members of the public.” Indeed, we would suspect that there is more, or at least equal, ingress and egress in a residence hall than in a jail. Similarly, a residence hall is likely to receive deliveries of supplies, mail, and food by nonresidents. Moreover, if the very limited access to a jail is not sufficient to preclude its characterization as a public building, the instant residence hall’s minimal security measures, while presumably effective, further justify a finding that the residence hall was a public building. Thus, we *624 believe that the Brown decision leads only to a conclusion that the residence hall was “open for use by members of the public.” Therefore, we conclude that the residence hall was a public building, as necessary to permit plaintiffs reliance on the public building exception to governmental immunity, MCL 691.1406.[2]
It is apparent that the Court of Appeals extracted the only rationale available from Brown, the statements about access by friends, family, and attorneys and for job applications and deliveries. It then applied that rationale to the facts. It is also apparent that the Court reasonably concluded that a jail would provide tighter security than a residence hall, locked or unlocked.
C. THE MAJORITY DECISION
Today, the majority reverses the decision of the Court of Appeals, even though, in light of the brief discussion in Brown, it would be difficult to reach another conclusion. The majority rejects the lower court’s rationale in its footnote 10, ante at 620:
The Court of Appeals determined that the delivery of supplies, mail, and food by non-residents rendered the residence hall open for use by members of the public. In reaching this conclusion, the Court of Appeals relied on dicta in Brown discussing deliveries to a jail. The Brown plurality opinion should not be read to suggest that mere deliveries are sufficient to render a building open for use by members of the public. The Court of Appeals erred in relying primarily on this dicta from Brown.
*625 If the Court of Appeals erred in relying on this dicta from Brown, it had no choice but to err; Brown provides nothing else on which to rely. Because the Court of Appeals decision was the only reasonable application of Brown, it was not clearly erroneous.
II. WITHOUT SPECIFIC FACTS, A “JAIL” AND A LOCKED RESIDENCE HALL MAY BOTH HAVE RESTRICTED ENTRY
Today, the majority proposes a two-part test for determining whether a government building is open for use by members of the public under § 6. First, there must not be “restricted entry to the building to those persons who are qualified on the basis of some individualized, limiting criteria of the government’s creation . . . .” Ante at 618. Second the building must be open for public use at the time of entry.
The test is derived from the statute and arguably provides a workable framework for deciding when a building is “open” under § 6. However, absent more facts, one cannot discern how the majority’s fact-intensive inquiry concludes that “a” jail is not subject to restricted entry, while this locked residence hall is.
Initially, I would note that the majority’s focus seems to have shifted from the type of building (a nonspecific “jail” in Brown) to the exact building at issue (Betsy Barbour Residence Hall, locked twenty-four hours a day). Brown implied that all jails would be “open” for purposes of § 6, without regard to the unique aspects of each.
Today, the majority focuses on the specific aspects of this locked residence hall. Presumably, it should not be compared to one of the large residence halls at Michigan State University that are open for classes and other events during the day. However, the distinc *626 tion between the generic analysis in Brown and the specific analysis here leads to confusion, as the majority does not disavow Brown at all. The bench and bar would benefit from an explanation of the proper focus for the § 6 inquiry.[3]
Next, without some comparison of the two buildings, I cannot conclude that the jail in Brown has less restricted entry than the residence hall in this case. Unless the jail has an open, walk-in lobby that members of the public can enter, which is possible, I see no meaningful distinction between the levels of restriction on entry. It seems unlikely that a member of the public could enter the interior of the jail, or this residence hall, unless he had business inside; *627 neither building would appear to permit one to stroll at will inside the facility.[4]
Again, I emphasize that there may be aspects of the jail in Brown that provide for less restricted entry than the residence hall in this case. The difficulty is thát the majority does not specify what those aspects are. The reader is left wondering, as the Court of Appeals obviously was, whether a nondescript jail is subject to fewer restrictions than this residence hall.
III. THE PROPOSED TEST IS NOT CLEARLY SET OUT
The majority’s test is spread out over the two pages of analysis. The reader is left to derive the relevant principles and to make sense of them in light of the earlier cases. Because the test announced in this case should be a helpful analytic tool, I would prefer that it were more clearly articulated.
IV. CONCLUSION
I cannot join the majority. The Court of Appeals made the only conclusion that Brown would support, and I find no error in it.

 464 Mich 430, 435-436; 628 NW2d 471 (2001).

 Unpublished opinion per curiam, issued January 11, 2002 (Docket No. 187738).

 Even in this case, the majority moves between general and specific focuses. For example, when discussing Kerbersky v Northern Michigan Univ, 458 Mich 525, 534; 528 NW2d 828 (1998), it notes that the Kerbersky Court reaffirmed that the public building exception would apply to “an ipjury sustained in a high school chemistry class . . . [even though] [v]ery few people could legitimately have been in this classroom.” The majority explains that this example can be distinguished from a locked residence hall because:
The phrase “limited access” was used in Kerbersky to explain that where access to part of a building is limited, the public-building exception may still apply if the building remains open for use by members of the public. Here, the concept of limited access is used in a different sense, i.e., to describe a building in which access to the entire building, or the general right of entry, is restricted to persons who are qualified to enter. [Ante at 618 n 9 (emphasis in original).]
Again, the majority generalizes about schools. It is undisputed that in some public schools today access to the entire building, not merely to particular classrooms, is restricted. Some high schools have guards who prevent access to everyone but employees and students; most do not. Nevertheless, it is apparent that one cannot conclude that public schools in general are open for use by members of the public under the proposed test. Instead, one must consider the characteristics of a particular school.

 The majority notes that “[mjembers of the public could not enter the building without using a courtesy phone to contact a resident and asking the resident to unlock the door.” Ante at 620. I imagine that a visitor to a jail would have to take at least equivalent steps to gain entry, such as passing through a guarded checkpoint. Again, this is conjecture because the jail in Brown is not described.